MORTON *v.* GREEN.

Morton v. Green.

EJECTMENT. An action for the recovery of real property under the Code can only be supported by showing a legal title in the plaintiff as contra-distinguished from an equitable title.

——. The holder of a receiver's certificate cannot, after the entry upon which the paper was issued has been cancelled, maintain an action of ejectment; for he has only an equitable title; and this notwithstanding sect. 411 of the Code of Civil Procedure, making such certificate proof of title equivalent to a patent against all but the holder of an actual patent.

——: *Jurisdiction.* The courts of law are without jurisdiction to interfere in controversies between adverse claimants of the public land until the government has, by the issuing of the patent or otherwise, parted with the legal title.

Error to the District Court for Lancaster County.

It was ejectment brought by Morton, Hopkins, & Manners, against Green & Smith, to recover the south half of the north-east quarter of section twenty-one (21), and the north half of the south-east quarter of section twenty-one (21), and the south-east quarter of the north-west quarter of said section twenty-one (21), all in township number ten (10), north of range number six (6), east of the sixth principal meridian. Green & Smith being lessees of the State, it intervened to defend the title. The petition and the answer of Green & Smith were in the usual form. The answer of the State alleged that it was the owner of the lands, and claimed title by virtue of the Act of Congress, approved July 22, 1854, entitled "An act to establish the office of Surveyor-General of New Mexico, Kansas, and Ne-

MORTON *v.* GREEN.

braska, to donate to actual settlers therein, and for other purposes; " also the act of Congress, approved on the 19th of April, A.D. 1854, entitled " An act to enable the people of Nebraska to form a constitution and State government, and for the admission of the State into the Union on equal footing with the original States; " and the act of Congress, approved Feb. 9, A.D. 1867, entitled " An act for the admission of the State of Nebraska into the Union; " and the State claims, and it has, through its proper officers, selected and located, said lands, and performed each and every act necessary to be done on its part to perfect its said titles to said lands. The cause was tried before Lake, J., and a jury. On the trial the plaintiff introduced in evidence two certificates, as follows : —

REGISTER'S OFFICE, NEBRASKA CITY, N.T., Sept. 12, 1859.

Military land-warrant, No. 80,268, in the name of Johanna George Elerle and Christine Constantin, has this day been located by John W. Prey upon the north half of south-east quarter of section twenty-one (21), and north-west quarter of the south-west quarter of section twenty-two (22), in township ten (10), north of range six (6), east, subject to any pre-emption claim which may be filed for said land within thirty days from this date.

Contents of tract located, one hundred and sixty acres, R & R 38. The dates of assignments in all cases must be given at the time they are acknowledged, and no assignment of this certificate will be regarded.

ÁND. HOPKINS, *Register.*

Military Bounty Land Act of 28th September, 1850.

MORTON *v.* GREEN.

REGISTER'S OFFICE, NEBRASKA CITY, N.T.,
Sept. 12, 1859.

Military land-warrant, No. 10,027, under the name of William B. Davis, has this day been located by John W. Prey upon the south half of the north-east quarter, the south-east quarter of the north-west quarter, and the north-east quarter of the south-west quarter, of section twenty-one (21), in township ten (10), north of range six (6), east, subject to any pre-emption claim which may be filed for said land within forty days from this date.

Contents of tract located, one hundred and sixty acres, R & R 57.          AND. HOPKINS, *Register.*

The plaintiffs then showed several mesne conveyances from Prey to themselves, and rested. The defendants then offered in evidence a certified copy of a letter from the Commissioner of the General Land-Office to the Register and Receiver, Feb. 17, 1862. The plaintiffs objected, and the Court overruled the objection; and the defendants read the same, as follows: —

GENERAL LAND OFFICE, Feb. 17, 1862.

GENTLEMEN, — For your information, I herewith enclose you a copy of the instructions from this office of present date to the surveyor-general at Leavenworth, Kansas, respecting not only the general examination he is required to make, to the end that all salt springs, salt licks and salines, shall be reported to the District Land-Office and to this office, in order that they may be respected as reserved lands, but particularly respecting eleven locations which had been allowed at your office upon certain tracts reported as salines.

Those eleven tracts, with the name of the locator

MORTON v. GREEN.

in each case, are described in the enclosed schedule " A "
herewith. As soon as the surveyor-general shall have
made a report to this office of the result of the exami-
nation in the eleven cases in question, you will be ad-
vised of the definite action of the department in the
matter.

Very respectfully your obedient servant,

(Signed)     J. M. EDMUNDS, *Commissioner.*

Register and Receiver, Nebraska City, Nebraska Ty.

The defendants also offered in evidence a letter from
the Commissioner of the General Land-Office, dated the
same day, addressed to the Surveyor-General of Nebras-
ka, &c., stating that, under the law, saline lands were
reserved from sale; that it was reported to him, that,
by collusion between surveyors and speculators, saline
lands had not been so reported as they should have been;
and directing that an examination be made by the latter
officer into the character of the lands here in question
among other tracts.

The proceedings of the surveyor-general in pursuance
of the above letter and his report were, under the plain-
tiff's exception, read in evidence, showing that the lands
in question were salines; also a letter from the com-
missioner to the register and receiver of the Local Land-
Office, dated June 20, 1862, that the locations, the certifi-
cates of which are above given, were cancelled because
the lands were saline, and therefore reserved from sale;
also evidence under like exception that the register and
receiver had accordingly noted the cancellations on their
plat and tract books; also a letter from the commis-
sioner to the local officers, dated Aug, 15, 1862, di-
recting them to return to the General Land-Office the
patents for the lands here in question, which had some

years before been sent to them for delivery to the parties. Oral evidence was given showing that the lands were salines.

The Court directed the jury to find a verdict for the defendants; which they did. Judgment being entered thereon, the plaintiffs filed this petition in error.

*D. Gantt,* for plaintiffs in error.

1. The Court erred in overruling the objections to, and admitting in evidence, the letters of the Commissioner of the General Land-Office, the letters of the surveyor-general, and reports of sub-agents of the government, because the same were *ex-parte* proceedings, and offered to show that the entry of the lands in question was cancelled by land-officers, who were successors to those who made and approved the contract with the purchaser.

By such contract of purchase of the land, the purchaser acquired a " vested right," which can only be set aside or cancelled according to law by a proper judicial tribunal, and not by the land-officers. *U. S. Constitutional Amendments,* Art. V. ; *Astrom et al.* v. *Hammond,* 3 *McLean,* 109; *Morton* v. *Blankership et al.,* 5 *Mo.,* 355; *Johnson* v. *Tousley, Sup. Ct. U. S.,* last term; *United States* v. *Stone,* 2 *Wallace,* 535–537; *United States* v. *Bank of Metropolis,* 15 *Peters,* 401; *Merrill* v. *Hartwell,* 11 *Mich.,* 20; *Harty* v. *Hull,* 2 *Binn.,* 511; *United States* v. *Willard,* — *Paine,* 539; *Janes* v. *Lawler,* 33 *Ala.,* 340; *Ware* v. *Brush,* 1 *McLean,* 535.

2. The only fair and legitimate construction of the fourth section of the Act of July 22, 1854, is to apply its provisions and inhibitions exclusively to the *donation system* of lands provided in the second and third sections. Any other interpretation will produce contra-

dictions in the act which cannot be harmonized; and will also bring this act in direct conflict with the proviso of the eleventh section of the Act of April 19, 1864. *Sturgis* v. *Crowninshield*, 4 *Wheat.*, 202.

3. The eleventh section of the Act of 19th April, 1864, clearly and distinctly recognizes a " vested right " to the land in question in J. W. Prey, grantor of plaintiffs, and thereby operates as a clear, sufficient, and indubitable affirmation and confirmation of title in the purchasers, and estops the United States from denying a " vested right " in the lands in the plaintiffs. *Fletcher* v. *Peck*, 6 *Cranch*, 137 ; *Strothers* v. *Lucas*, 12 *Peters*, 454 ; *Van Rensselaer* v. *Kearney*, 11 *How.*, 325 ; *Penrose* v. *Griffith*, 4 *Binn.*, 231.

4. The Act of May 18, 1796, that of March 26, 1804, and all other land acts of the government providing for the disposal of public lands, must, in respect to every one of such acts, according to every rule of construction, be limited in its application to those lands only which are designated in the act, and can extend only to lands in that Territory designated to which the Indian title had been extinguished. *Reynolds* v. *McArthur*, 2 *Peters*, 426 ; *Danforth's Lessee* v. *Thomas*, 1 *Wheat.*, 158 ; *Cherokee Nation* v. *State of Georgia*, 5 *Peters*, 17–48.

*James E. Philpott* and *Seth Robinson*, for Green & Smith, defendants in error.

I. 1. The act of the Commisioner of the General Land-Office in cancelling Prey's entry was not a ministerial duty, but a matter resting in his judgment and discretion, and within his jurisdiction, requiring the construction and consideration of many acts of Congress. *Gains* v. *Thompson*, 7 *Wallace*, 347, and cases there cited ; *Bates* v. *Herron*, 35 *Ala.*, 117 ; *O'Brien* v.

MORTON v. GREEN.

*Perry*, 1 *Black*, 132; *Harkness* v. *Underhill*, 1 *Black*, 316.

And the following cases to the contrary are not supported by any principle of sound reasoning, and the point was not necessary to their determination: *Groom* v. *Hill*, 9 *Miss.*, 323; *Perry* v. *O'Hunlon*, 11 *Miss.*, 585; *Arnold* v. *Grimes*, 2 *Iowa*, 1; *Brill* v. *Styles*, 35 *Ill.*, 305.

2. The operation of such action on the part of the commissioner was not, indeed, to destroy any of the equities of the plaintiffs or Prey; but it was effective to settle the question of the legal title between the plaintiffs and the United States: otherwise the plaintiffs might compel the issuance of a patent, and thereby clothe themselves with the legal title; but it is settled that this cannot be done. *Gains* v. *Thompson*, above cited.

3. The only ground upon which it can be claimed that the plaintiffs ever possessed the legal title to the land in controversy is furnished by sect. 411 of the Code of Civil Procedure, which makes the usual duplicate receiver's receipt proof of title equal to a patent against all but the patent itself. But, whatever force this section may be entitled to, it is subject, nevertheless, to the following qualifications, which are operative here; namely:—

(1.) The first qualification is, that whenever the question in any court, State or Federal, is, whether the title to land once the property of the United States has passed, that question must be resolved by the laws of the United States; but whenever, according to those laws, the title shall have passed, then that property, like all other property, becomes subject to State legislation, so far as that legislation is consistent with the admission that the title passed and vested according to

the laws of the United States. *Wilcox* v. *Jackson*, 13 *Peters*, 517 ; 3 *Washburn on Real Prop.*, 169.

(2.) The second qualification is, that until the patent has actually been issued, and the title passed in accordance with the laws of the United States, it remains subject to the control, judgment, and discretion of the executive department of the General Government; and it is only after the legal title has so passed from the United States, and the matter has ceased to be under the control of the executive department, that courts of justice will interfere, and decree the legal title to belong to the person against whom the department has decided. *Gains* v. *Thompson*, above cited.

4. How, then, can it be contended that the plaintiffs have legal title, when that title is impeached and effectually destroyed by the very record which is adduced in support of it?

5. Now, the legal title to the lands in controversy is vested either in the plaintiffs or in the defendants, or in the United States. It is not in the plaintiffs, for the reasons above stated. If it be not in the plaintiffs, it is immaterial in which of the others it may be ; for, if it be in either, the judgment of the Court below must be affirmed. If it be in the United States, the plaintiffs cannot prevail in any form of action : not in ejectment to recover the possession, because, to do that, they must allege and prove a legal estate in themselves ; not by bill to recover the title, because the United States is not a party, and could not be made a party. If it be in the defendants, they may prevail by first filing a bill to recover the legal title, but not in an ejectment to recover the possession.

The cancellation of Prey's entry left the plaintiffs but a mere equity. *Gains* v. *Thompson*, 7 *Wallace*, 347, 353 ; *Lytle* v. *Arkansas*, 9 *How.*, 315 ; *Barnard* v. *Ash-*

MORTON v. GREEN.

ley, 18 *How.*, 43 ; *Garland* v. *Wynn*, 20 *How.*, 6 ; *Bates* v. *Herron*, 35 *Ala.*, 117 ; *Brill* v. *Styles*, 35 *Ill.*, 305 ; *O'Brien* v. *Perry*, 1 *Black*, 132 ; *Harkness* v. *Underhill*, 1 *Black*, 316 ; *Hester* v. *Kembaugh*, 9 *S. & M.*, 130.

And no case can be found where ejectment has been supported upon a mere entry, backed only by a duplicate receiver's receipt, where the legal title has actually passed from the government to the defendant, or where the government has refused, through its proper officers, to part with the legal title, except in those States where ejectment will lie upon an equitable title ; and Missouri is such a State. *O'Brien* v. *Perry*, above cited ; see *Wilcox* v. *Jackson*, 13 *Peters*, 517.

Where the legal title has not passed from the government, or where it has passed to one party, another party holding a mere duplicate receiver's receipt necessarily has but an equitable title at best ; and an equitable title will not support an action of ejectment. *Jackson* v. *Harrington*, 9 *Cow.*, 88 ; *Jackson* v. *Sisson*, 2 *Johns. Cas.*, 321 ; *Jackson* v. *Van Slyck*, 8 *Johns.*, 486 ; *Jackson* v. *Demont*, 9 *Johns.*, 60 ; *Robinson* v. *Campbell*, 3 *Wheat.*, 212 ; *Fenn* v. *Holme*, 21 *How.*, 481 ; *Hickey* v. *Stewart*, 3 *How.*, 750 ; *Adams on Ejectment*, 43 *et seq.*, and *note* 1, and cases cited ; *Tyler on Ejectment*, 74 *et seq.*, and cases cited.

And the only way in which an equitable title can be assisted at law is by allowing the presumption to prevail in certain cases that there has been a conveyance of the legal estate. *Jackson* v. *Pierce*, 2 *Johns.*, 226 ; *Adams on Ejectment*, 44, *note* 1.

6. By special statute in some States, an equitable title which will support an action for a conveyance will support ejectment. *Adams on Ejectment*, 44, *notes ; Tyler on Ejectment*, 73. But in this State, by express enactment,

29

the action can only be maintained by him who holds the legal estate. *Code of Civil Procedure*, sect. 626.

II. Upon the second question which arises in the case the defendants rely upon the following points and authorities to sustain the judgment of the court below : —

1. Whenever a tract of land has been appropriated to public use, or reserved for any purpose, it is severed from the mass of the public domain; and subsequent laws are not construed to embrace it, though they do not in terms except it. *Wilcox* v. *Jackson*, 13 *Peters*, 513.

2. The following acts of Congress are applicable to the case at bar, and, if there were no others, would fully sustain the action of the commissioner in cancelling Prey's entries: Act 18th May, 1796, sect. 3; 1 *U. S. Stat.*, 466. Act 26th March, 1804, sect. 6; 2 *U. S. Stat.*, 277. Act 21st April, 1806, sect. 11; 2 *U. S. Stat.*, 391. Act 3d March, 1811, sect. 10; 2 *U. S. Stat.*, 665.

3. These and the following acts clearly show that the uniform policy of the government has been to reserve all saline lands from private entry, and to grant them to the several States : Act 3d March, 1807, sect. 2; 2 *U. S. Stat.*, 438. Act 29th February, 1808, sect. ; 2 *U. S. Stat.*, 470. Act 6th March, 1820, sect. 6, subd. 2; 3 *U. S. Stat.*, 547. Act 27th September, 1850, sect. 14; 9 *U. S. Stat.*, 500. Act 14th February, 1853, sect. 9; 10 *U. S. Stat.*, 159. Act 14th February, 1859, sect. 4, subd. 4; 11 *U. S. Stat.*, 383. Act 29th January, 1861, sect. 3, subd. 4; 12 *U. S. Stat.*, 127. Act 19th April, 1864, sect. 11. ; 13 *U. S. Stat.*, 49.

And these acts further show that the form of the grant of salt springs is uniform, and that there is nothing peculiar in the grant to this State.

4. The Act of 22d July, 1854, sect. 4, 10 *U. S. Stat.*, 308, expressly reserves saline lands in this State from

entry or sale, and is conclusive, not only against the title, but the right of the plaintiffs.

5. The defendants, being in possession under color of title, might impeach even a patent. *Crammelin* v. *Minter*, 9 *Ala.*, 594.

*Robert H.* and *James L. Bradford*, and *George H. Roberts*, *Attorney-General*, for the State, argued the same points, and also submitted a printed argument of forty-eight pages.

*E. Wakeley*, in reply for plaintiffs in error.

CROUNSE, J.

This was an action to recover the possession of lands, commonly styled an action of ejectment, and is purely legal in its character. The plaintiffs assert and must maintain a legal title to the lands claimed. Sect. 626, *Code of Civil Procedure*. By the laws of some States, ejectment may be sustained by proof of an equitable right to the lands, the possession of which is sought; and an examination of some of the cases urged upon the attention of this Court will show them to have arisen under laws of that kind, and of course they can have no bearing here.

The plaintiffs claim as grantees of one Prey. Prey's pretended title is from the United States, and is based on his attempt, in the year 1859, to obtain the lands in question by the location of land-warrants thereon. In the month of September of that year, he located his warrants, and received the usual certificate from the local land-office at Nebraska City. This was followed by the transmission of patents from the General Land-Office to the Local Office. Before their delivery, how-

MORTON *v.* GREEN.

ever, the Commissioner of the General Land-Office at
Washington, ascertaining that these lands were saline
and not agricultural lands, recalled the patents, and can-
celled the location of Prey ; claiming that the lands were
not subject to location or sale, but that they were re-
served by the Act of Congress of July 22, 1854.

To show how the defendants, Green & Smith, came
into possession, I may remark, that, by the act of
Congress admitting Nebraska as a State into the Union,
" all salt springs within said State, not exceeding twelve
in number, with six sections of land adjoining, or as con-
tiguous as may be to each, shall be granted to said State
for its use, the said lands to be selected by the governor
thereof within one year after the admission of the State,
and, when so selected, to be used or disposed of on such
terms, conditions, and regulations as the legislature shall
direct ; *provided* that no salt spring or lands, the right
whereof is now vested in any individual or individuals,
or which hereafter shall be confirmed or adjudged to any
individual or individuals, shall, by this act, be granted
to said State." I may say, in passing, that this proviso
has no peculiar application to the lands in question,
being such as is usually attached to lands of like kind.
Nebraska was admitted in March, 1867. In June of the
same year the governor made selection of saline lands,
including those in question. This selection was, at the
time of the trial, before the land department at Wash-
ington for approval. In the mean time the legislature
of Nebraska had given authority therefor, and the gov-
ernor had leased these saline lands to said Green &
Smith, who took possession of the same, and whom the
State has been let in to defend. Whether the act ad-
mitting Nebraska, and the selection of these lands by
the governor, gives title to the State without patent or
other evidence of title, I will not stop to discuss. The

MORTON *v.* GREEN.

plaintiffs aver that they " are seized in fee of" the lands in dispute. This they must maintain without reference to the strength of defendant's title.

The highest evidence of plaintiffs' title would be a patent from the United States. This they cannot produce; and they admit, that, for their failure to show one, they could not hope to succeed were it not for sect. 411 of the Code of Civil Procedure, which is relied on. That section says, " The usual duplicate receipt of the receiver of any land-office, or, if that be lost or destroyed or beyond the reach of the party, the certificate of such receiver that the books of his office show the sale of a tract of land to a certain individual, is proof of title equivalent to a patent against all but the holder of an actual patent." But it is answered, the certificate in this case has been cancelled or destroyed by the return of, or offer to return, the warrants, and the cancellation of Prey's location. To this it is replied, that the commissioner could not, by an *ex-parte* proceeding, destroy Prey's right to the land in question; that, admitting that, if these lands were reserved by law, the location was void, yet the commissioner was wrong in his interpretation of the Act of July, 1854.

Upon this branch of the case the argument of counsel on both sides was very able and elaborate; but in the view I take of the case I shall not follow in the discussion, nor consider the many interesting points debated. It is enough to know that the grantor of the plaintiffs not only never received a patent for these lands, but his right to do has most forcibly been denied by those acting for the United States. While, on the other hand, these lands have been selected under the general grant made by Congress, the State's lessees have entered upon them, and, from all that appears, are holding them with no suggestion of opposition from the government. What-

ever grounds Prey or his grantees may have to demand a patent from the government constitute at most an equitable right, which in a proper suit, with proper parties, might be declared. Until they can show this patent, they are not " seized in fee of " the lands in question. When a patent shall have rightfully passed to them, the United-States authorities cannot destroy it. Before it has passed, this State, by its courts or its legislature, is not competent to wrest it from the United States. Congress is given full power to dispose of the public lands of the United States, and to make all needful rules and regulations respecting the same. Sect. 3, Art. IV., *U. S. Constitution.* Accordingly Congress has, from time to time, passed laws providing for the sale or donation of the public lands; has appointed the officers through or by whom the title shall pass from the government to the grantee, and prescribed the steps to be taken before title shall pass. In the case before us, the first requirement for a valid location of these lands is, that they should be subject to sale or location. The first officers to act upon this question are the officers of the local land-office. They might refuse to permit a location on lands properly subject to it, or allow a location on lands properly reserved. Their action is not conclusive. An appeal is provided to the Commissioner of the General Land-Office from the decision of the local officers. From this officer an appeal can again be taken to the Secretary of the Interior Department. Many mistakes are likely to be committed by these different officers in disposing of the public lands; but their correction is left with these public officers in the control of their respective departments, and in the discharge of their several duties. But, until the issuance of a patent and the parting with the title by the government, the courts cannot interfere. *Litchfield* v. *The Register and Receiver*, 1 *Wool-*

MORTON *v.* GREEN.

*worth's Circuit-Court Reports,* 308; *Brewer* v. *Kidd,* 23 *Mich.,* 440; *Marbury* v. *Madison,* 1 *Cranch,* 137; *Kendall* v. *Stokes,* 12 *Peters,* 608; *State of Mississippi* v. *Johnson, President,* 4 *Wallace,* 475. In the cases of *Smiley* v. *Sampson,* and *Tousley* v. *Johnson,* reported in 1 *Nebraska Reports,* this Court sustained suits brought to recover the legal title from those who had wrongfully obtained patents from the government which of right should have been issued to the plaintiffs. We there felt at liberty to review and overrule the decision of the Federal officers in their interpretation or construction of United-States laws; and we were sustained in the United-States Supreme Court for so doing. But it will be remarked that the Court took no action, nor entertained jurisdiction, until a patent had been issued, and the lands had passed from the United States, and had fallen, in common with all other lands within the State, under State control or jurisdiction.

In *Bagnell* v. *Broderick,* 13 *Peters,* 450, it is said, " Congress has the sole power to give dignity and effect to titles emanating from the United States; and the whole legislation of the Federal Government in reference to the public lands declares the patent the superior and conclusive evidence of legal title : until it issues, the fee is in the government; by the patent, it passes to the grantee, and he is entitled to recover the possession in ejectment." As the State cannot compel the surrender by the government of a title, so it cannot, by any law it may pass, declare that to be a title that is not in fact such under the laws and regulations of the United States. Congress has granted a number of salt-springs and a quantity of lands to the State. The governor is selected to designate them. No provision is made for the issuing of patents for them, as under general land-laws. As between the United States and the State of Nebraska, the title to the lands selected may be regarded by both

MORTON *v.* GREEN.

as in the latter. Yet the plaintiffs, with a certificate that may have been unadvisedly issued in violation of law, and perhaps fearing to test the strength of their claim by appeal to the highest land-officer, seek to obtain the possession of lands upon a certificate worthless between themselves and the government, because they chance to hold it, and the State has no patents. This is attempting a use of the section of our Code referred to never designed, and one wholly unwarranted. To those familiar with delays attending proceedings in the land department, the purpose of the section is evident. It is quite usual for years to intervene between the purchase of a piece of land and receiving a patent therefor. That it is competent for the State to pass a law which will enable a purchaser to defend his possession of lands purchased from the General Government, and for which he has paid his money and taken his certificate, I will not question. There he holds in harmony with the government, his certificate is in force, and his right is complete, except the possession of the patent, which is sure to follow. The case is entirely different where it appears that a patent is denied, and the very certificate is destroyed as far as the government is able to do it. It is not the design of this law to enable a party to build up a right on an empty technicality like this, in subversion of well-established rules governing the acquirement of public lands. It applies in cases where the possessor of the certificate holds harmonious relations with the government.

In *Astrom et al.* v. *Hammond*, 3 *McLean's C. C., R.* 109, a bill was filed to restrain collection of taxes on land for which no patent had yet issued. The Court says, " Until the patent is issued, the purchaser has not the legal title; but having made his entry of the land, and paid his money for it, the government can no more

MORTON *v.* GREEN.

dispose of the land to another person than if the patent had issued. The final certificate, obtained on the payment of the money, is as binding on the government as the patent. " To language like this we are pointed, to show, that, being possessed of his certificate, Prey's right cannot be thus destroyed by the cancellation of his location. Taking the language alone, and as applied to the case there before the Court, it is all very proper; holding, as the purchaser did no doubt, in harmony with the government, he had every right in and to the land that a patentee would have, and should pay tax accordingly. And further: if the lands were subject to entry, and had been properly entered, with no superior claim ahead of it, the government could not destroy his right to the land, and his claim to have the patent for it; that is, it could not legally do so. But, as will be seen by reference to the cases cited above, although the purchaser may be entitled to a patent, the evidence of legal title, yet he could not compel its delivery by *mandamus*, nor enjoin the land-officers from giving the patent to a claimant not legally entitled to it. The purchaser, however clear his right may seem to be, must, when disputed, prosecute his claim through the several branches of the land department; and, if he fails there, he may, after the government has parted with the legal title by issuing a patent to another, proceed against such other person to obtain the legal title." This rule is well established; and there is nothing in *Astrom et al.* v. *Hammond,* or in those cases containing like expressions, which militates against it, or which is authority upon which to predicate the argument, that, because one is entitled to a legal title, he may, therefore, prosecute ejectments without first obtaining it.

The construction I place upon this action will, I think, be seen by a full reading of the section. In case

MORTON v. GREEN.

of the certificate being lost, or beyond the reach of the party, it provides that the certificate of the receiver, that the books of his office show the sale of a tract of land to a certain individual, may be introduced in evidence; the object evidently being to show, that, as between the purchaser and the United States, the former is rightly in possession, or is entitled to be. If, however, the books of the receiver were produced, or a transcript of them was offered in this case, the reverse of this would be shown. Further support of this view is found in the fact, that this section is standing alone, under a title relating to Evidence, with no other pertaining to public lands or equitable titles. If it had been the design to permit a recovery of the possession of lands upon proof of equitable right, there is no reason why it should be confined to the single case of a holder of a receiver's certificate.

For want of time, I have not investigated the correctness of the additional ground upon which my associate placed his decision in the District Court, that these lands were reserved, and not subject to sale or location. Neither have I deemed this the proper case in which to enter upon such examination. I choose to place my decision upon the one ground, that, under our statute to maintain ejectment in a case like this, the plaintiff must produce a patent, or show that he holds a final certificate in harmony with the government. If the plaintiffs are entitled to a patent, let them first obtain it: then ejectment will be in order. If they are not entitled to one, the Court should not permit them to build up a claim to lands of great value, to which they have no right, upon a simple certificate unlawfully and unadvisedly issued.

Justice Lake concurring in that conclusion, the judgment of the Court below is affirmed.

MORTON *v.* GREEN.

MASON, Ch. J., dissenting.

The question which must, in my opinion, determine this controversy, is, Were the lands in question reserved from sale by any or all of the several acts of Congress in relation thereto ? If they were so reserved, the plaintiff cannot recover ; and, if they were not, the plaintiff's grantees might legally enter the same, and their title by purchase is good until the contract of purchase from the government is legally set aside or annulled.

The first question depends entirely upon the construction of certain acts of Congress ; and it may be well to advert for a moment to some of the rules and principles governing the interpretation of statutes. The end and aim of all interpretations or constructions is to ascertain the will or intention of the lawgiver. In order to find this intention, we must look first to the words of the statute. If these are clear and explicit, and convey no doubtful meaning, then there is no room for interpretation. Where there is no ambiguity, there can be no construction. It is not admissible to search for occult meanings when the words themselves are perspicuous and unambiguous ; but when the words of a particular clause of a statute are ambiguous, or when, taken literally, they would plainly contradict other clauses of the same statute, or lead to some manifest absurdity, or to some consequences which we see plainly could not have been intended, or to result manifestly against the general term, scope, and purpose of the law, then we may apply the rules of construction to ascertain the meaning and intent of the lawgiver, and bring the whole statute into harmony if possible.

These principles being universally received by courts and jurists, I cite no authorities to sustain them. Keeping them distinctly in mind, let us proceed to consider

the statutes of Congress bearing upon this case, and the saline lands in controversy.

The question of reservation turns mainly, but not entirely, upon the construction of the fourth section of the Act of 1854. In my opinion, the eleventh section of the Act of 1864, admitting Nebraska into the Union, has a most important bearing on the question at issue, which will hereafter be considered.

But let us first consider the fourth section of the Act of 1854. That section occurs in an act providing for the disposition of the public lands in New Mexico, Kansas, and Nebraska. In one respect, the act under consideration is peculiar. It is really two distinct acts in one. From the first to the tenth section, the act seems to be devoted entirely to the public lands of New Mexico. At the tenth section, a new act commenced making exclusive provisions for public lands of Kansas and Nebraska. Whoever shall read this statute, will see, that although it purports to be, and is, one statute in form, yet in fact and in substance it contains two several and distinct laws, — one wholly applicable to New Mexico, the other entirely devoted to Kansas and Nebraska. It is in the part of this statute applicable to New Mexico that the fourth section occurs. The material clause of that section is as follows : " None of the provisions of this act shall extend to mineral or school lands, saline, military, or other reservations, or lands settled on or occupied for the purpose of trade and commerce, and not for agriculture."

Now, it is contended that these words must be taken literally, and that they apply to the whole statute, as well to the provisions going before the fourth section as to those which follow it, as well to the provisions of the statute relating to the public lands of Nebraska as to those which have reference to the public lands of New Mexico.

Morton *v.* Green.

Here it is inferred that the saline lands of Nebraska were, by the terms of this fourth section, reserved from sale ; it being expressly provided in the part of the statute relating to the lands of Kansas and Nebraska, that the provisions should be authorized to cause the surveyed lands of those Territories to be exposed to sale from time to time, in the same manner, and upon the same terms and conditions, as the other public lands of the United States. It seems to me quite impossible to give to the fourth section the construction suggested and contended for by the defendants, because it will be presently shown conclusively that such a construction would make the act plainly contradict itself. It would be absurd to say literally that none of the provisions of this act extend to school lands, because the fifth and sixth sections which immediately follow provide in express terms that sections 16 and 36 in each township in said Territory shall be reserved for the purpose of being applied to schools in said Territory, and that a quantity of lands equal to two townships shall be reserved for the establishment of a university in said Territory. Giving the act the literal construction claimed for it by the defendants, and put upon it by the Court below, it is made to contradict itself, since some of its express conditions so extend to school lands; whereas the terms of the fourth section, taken literally, declare that some of its provisions shall extend to school lands, &c. Hence we have the right to infer and conclude that the construction insisted upon by the defendants is a false interpretation of the fourth section, and that those who framed that section did not intend to apply its terms to the subsequent sections of the act. To my mind it is perfectly clear that the framers of the act intended the fourth section to apply to what immediately preceded it ; that is to say, that none of the foregoing provisions of this act shall extend to mineral or

school lands, salines, &c. The second and third sections of the Act of 1854 provide for donations of land to the amount of a hundred and sixty acres in the Territory of New Mexico, on condition of actual settlement and improvement upon the same. In this the manifest purpose of Congress is obvious. It was to invite and tempt agricultural settlers into a far-distant, sparsely-populated, and sterile Territory. No donations were necessary to induce the enterprising miner or salt-maker to occupy and develop the invaluable saline or mineral lands of the Territory. Hence Congress did not intend that that class of emigrants should have the benefit of the donation clause : therefore the fourth section, — " none of the provisions of this act shall extend to mineral, school, or saline lands, or to military or other reservations."

Can any one doubt what was in the mind of the framers of this statute when the fourth section was drawn ? Their minds were then upon the provisions which had gone before, not those which were yet to follow the fourth section.

It was the manifest intention of Congress to protect the mineral, school, saline, and other reserved lands of New Mexico, by express terms, from the operation of the donation clause which preceded the fourth section. But for this provision of the fourth section, the invaluable mineral lands of that Territory might have been given away without promoting the real object of Congress in the donation clause ; which was, to encourage actual settlement and improvement by agricultural emigrants. Could it possibly have been the intention of Congress, by applying this fourth section to all subsequent provisions of the act, to make a general reservation of all mineral, school, and saline lands in New Mexico, Kansas, and Nebraska ? This is exactly what the defendants contend for, and what was ruled in the Court below. The defendants

Morton *v.* Green.

contend, that by applying the fourth section, not to what preceded it in the act, but to all the other provisions of the act, Congress intended to reserve from sale all mineral lands, all school lands, and all saline lands, in the three Territories referred to. Now, if this be so as to New Mexico, why did Congress, in the next section of the act, expressly reserve from sale for school-purposes the sixteenth and thirty-sixth sections, and two townships for university-purposes for that Territory? Why, if Congress had already reserved in the fourth section lands for school-purposes, should this language be used by that body in the fifth section? — "Sections 16 and 36 in each township in said Territory shall be, and the same are hereby, reserved for the purpose of being applied to schools in said Territory," &c. And why is language of the same import used in the sixth section? Why not say, "The foregoing reservations, or the reservations made in the fourth section, shall consist of the sixteenth and thirty-sixth sections, or a quantity equal to two townships," &c.?

From what is said in the fifth and sixth sections, is it not clear that Congress did not consider the language of the fourth section as providing for a reservation at all, but only as a provision withdrawing all mineral, saline, school lands, &c., in the Territory of New Mexico, from the operations of the donation clause contained in the eighth section of said act? The defendants contend that it was the purpose of the fourth section to reserve from sale the saline, mineral, and school lands of all three Territories, — New Mexico, Kansas, and Nebraska. This could not have been its purpose as to the school lands of New Mexico, since these were expressly reserved by the fifth and sixth sections of the same act, as we have seen.

Nor could it have been the intention of the fourth sec-

tion to reserve from sale the school lands of Kansas and Nebraska, because Congress had already, in the most express and unequivocal manner, reserved from sale the school lands of Kansas and Nebraska. See Act of May, 1854, creating a Territorial government for these Territories, sects. 3 and 16. Now, as these acts were in full force and unrepealed, it would have been a work of supererogation for Congress to provide a second time for the reservation of school lands in these two Territories. Certainly, if the fourth section was intended to work a reservation of saline and mineral lands, it was equally its purpose to reserve the school lands. But we have seen that it was not its purpose to reserve the school lands; and we conclude that it could not have been intended as a provision for the reservation of saline and mineral lands, but simply a prohibition to prevent the occupancy of the mineral, saline, and school lands of New Mexico by settlers, under the donation clause of the act which was contained in the sections preceding the fourth section of the act. The very same argument, by which it is sought to be shown that it was the purpose of the fourth section to operate as a reservation of mineral and saline lands, would also demonstrate that it was intended to work reservation of school lands.

Thus the fourth section provides that none of the provisions of the act shall extend to mineral, school, or saline lands. Then, if none of its provisions extend to these lands, the President, under the last clause of the act giving him the authority to cause the surveyed lands of Kansas and Nebraska to be sold, would have no authority to expose to sale any saline, mineral, or school lands. Nothing whatever is here said about any reservation of lands; but, according to the argument of the defendants and the ruling of the Court below, it is to be inferred, from the fourth section and the last clause

of the act taken together, that Congress intended to prohibit the President from selling the specified classes of lands. The reservation is a matter of inference, not of express provision. But, if Congress in this way intended to restrain the President from selling mineral and saline lands, it is clear that they also intended to provide that he should not expose to sale the school lands of Kansas and Nebraska which had been especially reserved by a previous act.

If, by this circumlocution, it was intended by Congress to reserve the mineral and saline lands from sale, it must have been its purpose to reserve again the school lands which had already been reserved.

How absurd to suppose that the Congress of the United States intended by the fourth section, taken in connection with the last clause of the act, to provide that the President of the United States should not be authorized to expose to sale the school lands of Kansas and Nebraska! Those school lands had been expressly reserved from sale. This reservation placed the school lands beyond the power of sale by the President.

Why, then, provide again that he should not sell them? If it was the purpose of Congress to reserve from sale the saline lands of Kansas and Nebraska, why has not Congress said so in express terms in some one of the various statutes relating to those Territories? Why this circumlocution? Why deem so important a thing to be made out by mere inference drawn from fine, sparse arguments? We have seen, that, in the acts organizing Territorial governments for Kansas and Nebraska, Congress had occasion to legislate, and did in fact legislate, upon the subject of reservations. This subject of reservation in Nebraska was under its consideration. Congress made a reservation of school lands in express and unequivocal terms.

MORTON v. GREEN.

Why, if it was intended by Congress to withhold the saline lands of Nebraska from sale, did not that body then say so in express terms? A few words would have removed all doubt. Why were not these few words uttered? Why did Congress pass in silence the reservation of saline lands while providing for other reservations, leaving the reservation of saline lands in Nebraska to be made out by the conjuration of magic by some astute legal dialectician?

It is remarkable that Congress had, in several prior acts organizing governments for Territories, or providing for the sale of public lands therein, incorporated express provisions reserving the saline lands from sale. Some of these various acts must have been present to the mind of Congress when the statute relating to Kansas and Nebraska was framed and passed. Why, then, did Congress omit from the statute relating to Kansas and Nebraska any express provisions reserving the saline lands in those Territories from sale? The only rational answer is, that Congress did not intend to reserve from sale the saline lands of Kansas and Nebraska, and therefore omitted the provision in question. This conclusion, as to the purpose of Congress in regard to the reservation of the saline lands of Kansas and Nebraska, is rendered very plain and imperative by the proviso to the section of the act admitting those Territories into the Union relating to salt springs. After providing that all salt springs within said State, not exceeding twelve in number, with six sections of lands adjoining, shall be granted to said State, &c., the said lands to be selected by the government thereof, we find the following proviso: "That no salt springs or lands, the right whereof is now vested in any individual or individuals, or which shall hereafter be confirmed or adjudged to any individual or individuals, shall, by this act, be granted to said State."

MORTON *v.* GREEN.

Now, here is a clear recognition of the fact that individuals might, prior to the passage of these acts, have acquired vested rights to saline lands in Kansas and Nebraska. This proviso speaks, not of mere claims set up or asserted by individuals, but of vested rights acquired by them. Now, if all saline lands had been reserved from sale by previous acts of Congress, how could any vested rights have accrued to individuals in such lands? If the President had sold and patented any reserved lands, his acts in so doing would have been void. The purchaser would have acquired no title; and his entry upon the lands under his void patent would have been a trespass. It would have been absurd for Congress to speak of a right acquired to reserved lands as a vested right; and, even if Congress had been disposed to pass an act for the sale of such trespasses, that body would not have been guilty of the absurdity of calling his claim a vested right.

Suppose the President had sold and conveyed reserved lands out of the sixteenth section: would Congress, if it had made provision for the sale of the purchaser, have called his claim a vested right in the land? This proviso renders it indubitable to my mind that it could not have been the intention of Congress to reserve from sale the saline lands of Kansas and Nebraska. But suppose the saline lands of Kansas and Nebraska had been, in fact, reserved from sale by act of Congress: what then? I insist, that, even in that case, the proviso in question would have been a clear and indubitable confirmation of a title acquired by the purchase and payment of the money to the United States for the land.

If these saline lands were reserved at all, they were of course reserved to the United States: such reservation, if made, was not to any State or Territory, but to the United States. It was, beyond doubt, perfectly

competent for the United States to grant these reserved lands at any time before they became vested in the States to any individual or individuals; and this grant could be made either by an act of Congress directly to the grantee, or by a patent from the President, confirmed and recognized by a subsequent act of Congress. Nor would it be necessary that Congress should, by direct and technical language, confirm a sale and patent title to reserved lands. Any language in an act of Congress subsequent to the sale by the government, and the receipt of the purchase-money, clearly implying a recognition of the purchaser's title, would amount to a confirmation, and render the title perfect against all the world. Now, what do we find the facts to be in the case at bar, assuming, which is not the fact, that the lands in question were reserved? The lands were offered at public sale by the President of the United States, and not sold for want of bidders. They were subsequently entered at private entry by the plaintiff's grantees, and the government received the purchase-money therefor: this was a bargain and sale. Subsequently the government of the United States issued patents for the lands, and forwarded the same to the local land-office for delivery. For some cause, they were not delivered. The President issued patents to be delivered to the purchaser, the plaintiff's grantees. Up to this time, no State or individual had acquired any right to the land in question. What next? Congress, in an act making a donation to the State of Nebraska, not of all the salt lands in the State, but of a certain limited quantity thereof, expressly provided that no salt lands in the State, the right whereof is now vested in any individual or individuals, shall by this act be granted to said State. To what lands, the right whereof was then vested in individuals, could Congress probably

MORTON *v.* GREEN.

have referred, except to such as the President had sold and received the purchase-price thereof, and patented to individuals? Who could probably have had a greater claim upon the equitable consideration of Congress than the individual who had purchased the lands from the Executive, and paid his money into the public treasury for it? How could any individual, in the estimation of Congress, have acquired any vested rights in reserved lands, except by purchase from the government or a patent from the President?

Congress did then, beyond doubt, recognize the title acquired by the plaintiffs' grantees to these saline lands in controversy as a vested right; and they, by express provision, refused to grant the same to the State of Nebraska.

If this language does not amount to a confirmation of title in these plaintiffs and their grantees, it is idle and useless to talk of the meaning of words. Who shall take away these vested rights, recognized by Congress, to lands which that body had the power to dispose of at pleasure?

Can this State afford to thus wrong and outrage the humblest of her citizens in his rights of property? I cannot in silence consent that this Court shall lend its sanction to an outrage so palpable and plain to my mind. It is doubtless true, that Congress, when adopting the proviso in question, had in view the fact that some of the purchasers of saline lands may have made valuable improvements, and expended money for manufacturing purposes, and that it would have been an act of the greatest injustice for the government to donate the lands thus held to the State under such circumstances.

It is sufficient to say, that it is plain that Congress did not donate any saline lands to the State to which any

individual or individuals had acquired a vested right. It will not be denied that these plaintiffs and their grantees had acquired a vested right in these lands by the payment of the purchase-money and the contract of bargain and sale.

The only question which remains to be considered is the effect of the attempted cancellation of the certificate of purchase issued to plaintiffs' grantees, and the refusal of the government officers to deliver the patent for these lands.

*Groven* v. *Hill*, 9 *Mo.*, 324. The facts of that case were as follows: It was an action of ejectment, brought by Hill, the defendant in error, to recover the possession of a tract of land in Montgomery County. The declaration contains two counts. In the first place, the plaintiff claimed the east half of the north-west quarter of section 32, township 47, range 5; and in the second count he claimed forty acres, part of the eighty-acre tract in the first count mentioned. The defendants pleaded the general issue, and also the plea of former recovery. To the plea of former recovery the plaintiff replied *nul tiel* record. Upon the trial of the issues, the defendant, to support the plea of former recovery, offered in evidence the record of a former suit between the same parties, concerning the forty-acre tract mentioned in the second count of the declaration; which record was rejected. Upon the general issue, the plaintiff offered in evidence the receiver's receipt and usual certificate of entry for the east half of the north-west quarter of section 32, township 47, range 5. The defendant then submitted proof, showing, that on the 1st of February, 1833, he sent an agent to St. Louis to enter the forty-acre tract described in the plaintiff's declaration; that said agent applied to enter said tract, but was informed that it

MORTON *v.* GREEN.

could not be entered, as there was at that time a vacancy in the office of receiver, but that he might leave his money with him until a receiver was appointed. This was accordingly done. During the month of August following, hearing of the appointment of a receiver, the defendant again sent his agent to St. Louis for the purpose of entering the land; but it was discovered that the plaintiff had in the mean time entered it. The register, however, informed the defendant's agent that he would write to the Commissioner of the General Land-Office, and have Hill's entry cancelled. A correspondence between the said commissioner and the officers at St. Louis was then read in evidence, from which it appeared that the commissioner had in fact vacated and cancelled Hill's entry, and directed the Land-Office to allow Groven to enter the land, and ordered Hill's entry to be repaid. The money was tendered to Hill, but declined. Groven's certificate of entry was dated Aug. 16, 1833. A jury was waived, and cause tried before the Court, and issues found for Hill. There was a motion for a new trial, which was overruled. Hill, the defendant, held a cancelled certificate of entry of prior date to the uncancelled certificate of entry held by Groven for the same land. The Court say the question is narrowed down to the relative value of an entry made in March, 1833, and a subsequent entry of the same lands in the following August; no patent being issued in either case, and there being no imputation of fraud in either case. Both titles being of equal dignity, the one prior in time must prevail. As to the proceedings at Washington subsequent to the sale of the land to Hill, in which it seems the Commissioner of the General Land-Office undertook to cancel and vacate the entry, and authorized a return of the purchase-money, it is not perceived how those proceedings, admitting

them to be properly authenticated and duly authorized by law, could affect the merits of Hill's title. If Hill's entry was illegal or void, that fact would be shown, but must be shown to the satisfaction of the Court in which the action is pending.

It is probably the duty of the commissioner to revise the proceedings of the register and receiver, and vacate entries which may have been illegally made, and thereby arrest the completion of a title originating in fraud, mistake, or violation of law; but, until his action assumes a shape recognized by law, it cannot effect a previous sale. The sale stands for what it is worth at the time it was made, and cannot be vitiated or annulled, cancelled or set aside, by any subsequent *ex-parte* proceedings of the officers, provided it was legal and valid at the time it was made; and of its legality and validity the courts must necessarily be the judges.

In the absence of proof showing any illegality, fraud, or irregularity, the oldest entry must prevail over a subsequent entry. It is not pretended that the lands here in controversy were reserved from sale, or that they were not subject to private entry, or that there was any fraud or illegality in the entry and purchase of the same. If these lands were subject to private entry, I cannot conceive how there could be any fraud in the entry of the same. The government says to all its citizens, " Pay the price fixed by law per acre, and take the lands." The citizen accepts the proposition of the government, pays the price, and takes his certificate of entry. No power short of a judicial proceeding in a court of competent jurisdiction can set aside this contract of bargain and sale. The action of the commissioner in attempting to do so is a mere nullity, and does not affect the legality of the certificate of purchase. See *Stephenson* v. *Smith*, 7 *Mo.*, 610; *Graves's*

MORTON *v.* GREEN.

---

*Heirs* v. *Frulsom*, 16 *Mo.*, 543; *Carman* v. *Johnson*, 29 *Mo.*, 89.

In that class of cases in which the land department of the government is made a special judicial tribunal to determine questions of settlement, inhabitancy, and improvement between conflicting claimants to the same tract of land, the right to review and reverse their judgments is not denied in respect to all questions and matters committed to such judicial discretion.

But in cases like the present, where the land department is invested with no judicial power, but simply acts in an uninterested capacity to receive the purchase-money, issue the certificate of entry, and issue the patent, the purchaser's rights cannot be affected by an arbitrary fiat of cancellation. The Commissioner of the General Land-Office, in this class of cases, has no power to cancel the certificate of entry; and his attempt to do so is a nullity.

In the case of *Smiley* v. *Sampson*, determined in this Court, and reported .in 1 *Nebraska*, the question under consideration being, whether the Act of Congress of March 3, 1843, prohibited a second filing on unoffered lands, the Secretary of the Interior having held that it did, and for that reason alone rejected Smiley's filing his pre-emption claim to the land, this Court said, " This is a question of law upon which we are bound by no opinion of the officers. Our inquiries are independent of such opinion, except as the reason assigned by the secretary and his high official position entitle it to respect. And the Court further say, the honorable secretary was clearly wrong in holding that Smiley exhausted his right under the pre-emption law, when, in 1857, he filed on one piece of land; and that, having withdrawn that statement, and completely abandoned the tract, he could not file on the lands here in question, and thus

enjoy the privileges he had not willingly forfeited." Again : in the same case the Court say, " It is a well-established principle, that when an individual in the prosecution of a right does every thing that the law requires of him to do, and he fails to attain his right by the misconduct or the unlawful act or neglect of a public officer, the law will protect him ; " and they cite, in support of this proposition, *Lytle* v. *Arkansas,* 9 *How.*

What are the facts presented in the case at bar? The commissioner undertook to cancel the entry of the lands in controversy. If they were not subject to private entry, if they had been reserved, the purchaser would acquire no right to the land by his entry ; and the land department might rightfully treat the entry as a nullity, — as void, and of no effect. If the lands in controversy were subject to sale and private entry, the purchaser, by the payment of the money and the issuance of the certificate of entry, acquired an equitable title to the land, and a right to the patent. The patents were issued by the government, as this record shows, and forwarded to the local land-office for delivery, but were not delivered. The effect of our statute making the certificate of entry, or the usual duplicate receipt of the receiver of any land-office, or if that be lost or destroyed, or beyond the reach of the party, the certificate of such receiver that the books of his office show the sale of a tract of land to a certain individual, proof of a title equivalent to a patent against all but the holder of an actual patent, is to permit a recovery in ejectment in this class of cases upon an equitable title. The holder of such a certificate has only an equitable title. Until the patent issues, the legal title is in the government. These plaintiffs, then, had the equitable title to these lands, evidenced by the usual duplicate receipt of the receiver of the land-office.

Morton *v.* Green.

The plat-books showed a cancellation of this receipt. Was this act of cancellation authorized by law? Was it a legal act, or an act unauthorized by law, and void? The plaintiffs' grantees were purchasers from the government for value. I do not think the fiat of a mere government official ought to be accepted by the courts as a sufficient reason for annulling a contract, even when the State of Nebraska is to be benefited thereby, and the wrong thus done was to one of the humblest of her citizens. A mere subordinate officer ought not to be allowed to place himself above the law. I know of no way of annulling contracts but by consent of parties, or by judicial proceedings for that purpose. The act of the land department in cancelling the entry of these lands, being unauthorized and illegal, did not take away the legal effect of the certificate of entry, nor deprive the plaintiffs of any of their vested legal rights. It is a fundamental doctrine of the English common law, and with us an elemental constitutional principle, that no person shall suffer without express law, either in his life, limb, liberty, good name, or *estate*, nor without being first brought to answer by due course of law. If this be so, can the mere fiat, the arbitrary and unauthorized act, of a ministerial officer of the Federal Government, destroy the evidence of title to the estate of the poorest citizen, and thus deprive him of his vested property rights? Where is the due course of law in thus depriving the citizen of his possession of his estate? What disposition is made, in the holding of the majority of this Court, of the undeniable right of the citizen to be held before the evidence of title to his estate is annulled and destroyed, and he by that means deprived of his estate? What becomes of the rule which requires that due proof shall precede conviction, and that private property shall not be taken for public use without com-

pensation, and shall not be taken at all for private use without the consent of the owner?

But in this case at bar we have said the patent had been issued to the plaintiffs' grantees, but not delivered by the ministerial officer of the government. The Court say in 2 *Wallace*, 535, *United States* v. *Stone*, " A patent is the highest evidence of title, and is conclusive as against the government, and all claiming under junior patents or titles, until it is set aside or annulled by some judicial tribunal. In England this was done by *scire facias;* but a bill in chancery is found a more convenient remedy." Again : in *Carrol* v. *Safford*, 3 *How.*, 460, the Court say, " When land was purchased and paid for, it was no longer the property of the United States, but of the purchaser. He held for it a final certificate, which could no more be cancelled by the United States than a patent. An officer of the land-office is not competent to cancel or annul a certificate of entry or a patent. That is a judicial act, and requires the judgment of a court. Until a patent is issued, the purchaser has not the legal title ; but having made his entry of the land, and paid for it, the government can no more dispose of the land to another person than if the patent had been issued. The final certificate obtained on the payment of the money is as binding on the government as the patent. No person can be deprived of life, liberty, or property, without due process of law." The Court say in *Morton* v. *Blankership & Reden*, 5 *Mo.*, 355, " The proceedings by which Hayden's entry was attempted to be vacated were clearly not proceedings authorized by any law of the land, and were, therefore, an attempt to deprive him of his property without due process of law. If his title was defective, this defect under the existing law could be determined only in the courts of justice. The attempt to vacate

MORTON v. GREEN.

Hayden's entry was an attempt to deprive him of his property without the intermittence of the judgment of his peers, contrary to the law of the land, without any due process of law, and in a mode unknown to the land. In attempting to vacate Hayden's entry, the commissioner attempted to do that which he had no power to do; and, as he had no power to vacate, Hayden's entry was not vacated.

I adopt the principle above laid down; and it follows that the act of the Commissioner of the Land-Office in cancelling the entry of these lands was unauthorized, without any legal authority, and a mere nullity, and did not destroy the legal effect of these certificates. The mere fact that these certificates of entry of the lands in question were declared void, and cancelled by the Commissioner of the General Land-Office, did not have the effect of vacating the entry. He is not a judicial officer, and has no power to decree the revision of contracts. His determination in relation to the validity of the sale of these lands concluded no one in his rights, and did not destroy the legal effect of the certificate of the Receiver of the General Land-Office. They should then be given the effect which the statute-law of our State has declared they shall have. If the rule is established, that the commissioner may, by his own unauthorized fiat, cancel certificates of entry and patents at any time before the delivery of the patent, then indeed the citizen will be deprived of his property without due process of law, and will hold his possessions, not by law, but by the grace of the Commissioner of the General Land-Office.

The record shows errors in the admission of evidence which was objected to by the plaintiffs, and exceptions noted to the same. It would follow, from the views here expressed, that the admission of the *ex-parte* proceed-

MORTON *v.* GREEN.

ings had before the commissioner was error, as well as the report of the sub-agent of the government in respect to these lands; but it is not necessary to consider these questions. The judgment of the Court below should be reversed, and judgment entered here for the plaintiffs.